IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal No. 2:22CR122 |
| v. ) | |
| ) | |
| PIERRE DE ROMEO SMITH, ) | |
| ) | |
| Defendant. ) | |

POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States of America, through its attorneys, Jessica D. Aber, United States Attorney, and Megan M. Montoya and E. Rebecca Gantt, Assistant United States Attorneys, hereby submits its position with respect to the defendant's sentencing factors. In the Presentence Investigation Report (PSR) prepared in this matter, the United States Probation Office determined the applicable guideline sentence to be a term of life imprisonment, based upon an Offense Level Total of 44 and a Criminal History Category of VI. In accordance with Section 6A1.2 of the Sentencing Guidelines Manual and this Court's policy regarding sentencing, the United States represents that it has reviewed the PSR and has one objection, as discussed herein.

Based on the nature of the offense, and the defendant's characteristics, the United States respectfully submits that a 40-year term of imprisonment would fulfill the purposes set forth in 18 U.S.C. § 3553(a).

**I.     Background**

On September 2, 2022, the defendant was named in a two-count Criminal Complaint. ECF No. 3. Count One charged the defendant with Sex Trafficking of a Minor or by Force, Fraud and Coercion, in violation of 18 U.S.C. § 1591. Count Two charged the defendant with Conspiracy to Commit Drug Trafficking, in violation of 21 U.S.C. §§ 846 and 841.

On September 21, 2022, Pierre De Romeo Smith was named in a seven-count Indictment returned by an Eastern District of Virginia, Norfolk Division, Grand Jury. ECF No. 12. Count One charges the defendant with Sex Trafficking by Force, Fraud and Coercion, in violation of 18 U.S.C. § 1591(a)(1), (b)(1) and 2. Count Two charges the defendant with Sex Trafficking of a Minor, in violation of 18 U.S.C. § 1591(a)(1), (b)(2), and 2. Count Three charges the defendant with Production of a Visual Depiction of Minor Engaged in Sexually Explicit Conduct, in violation of 18 U.S.C. § 2251(a) and 2. Count Four charges the defendant with Possession with the Intent to Distribute Cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Count Five charges the defendant with Possession with the Intent to Distribute Fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Count Six charges the defendant with Possession with the Intent to Distribute Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Count Seven charges the defendant with Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1) and (b)(1)(C).

On September 29, 2022, the defendant pled not guilty to all charges at his arraignment. ECF No. 20. On April 3, 2023, a jury trial commenced before this Court. ECF No. 53. On April 6, 2023, the defendant was found guilty of Counts One through Seven of the Indictment. ECF No. 64. Sentencing was continued pending the completion of a presentence report.

II.     **Objections**

The defendant objects to the jury's finding and generally objects to all the factual material in the offense conduct section of the presentence report. This objection should be overruled absent any affirmative showing of inaccuracy. *See United States v. Manigan*, 592 F.3d 621, 632 (4th Cir. 2010); *United States v. Love*, 134 F.3d 595, 606 (4th Cir. 1998) ("A mere objection to the finding in the presentence report is not sufficient.... Without an affirmative

showing the information is inaccurate, the court is free to adopt the findings of the presentence report] without more specific inquiry or explanation." (internal citation and punctuation omitted)). The government need not reprove the facts as shown at trial. Rather, the "defendant has an affirmative duty to make a showing that the information in the presentence report is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate." *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990). As such, the Court can rely on the evidence presented at trial and recited in the PSR at sentencing.

The government objects to not applying a two-level enhancement for Jane Doe being "in the custody, care, or supervisory control of the defendant." USSG §§ 2G1.3(b)(1)(B), 2G2.1(b)(5). Given that the defendant's offense level is already 44 without this enhancement, the resolution of this objection does not affect the advisory guidelines sentencing range. *See* Fed. R. Crim. P. 32(i)(3) (rather than ruling on a disputed portion of the PSR, court may determine that a ruling is unnecessary because the matter will not affect sentencing). Nonetheless, this enhancement is warranted under the guidelines, and it also captures some of the most egregious aspects of the defendant's conduct in his exploitation of Jane Doe's vulnerabilities.

The government bears the burden of demonstrating that a disputed enhancement applies by preponderance of the evidence. *United States v. Arbaugh*, 951 F.3d 167, 173 (4th Cir. 2020). The enhancement at issue here pertains to both Count Group 1, the sex trafficking counts, governed by USSG § 2G1.3, and Count 3, the child pornography production count, governed by USSG § 2G2.1. Both provisions contain the following nearly-identically-worded enhancements:

> If (A) the defendant was a parent, relative, or legal guardian of the minor; or (B) the minor was otherwise in the custody, care, or supervisory control of the defendant, increase by 2 levels. USSG § 2G1.3(b)(1).

3

> If the defendant was a parent, relative, or legal guardian of the minor involved in the offense, or if the minor was otherwise in the custody, care, or supervisory control of the defendant, increase by 2 levels. USSG § 2G2.1(b)(5).

Although the defendant did not have an official legal designation with respect to Jane Doe and he was not her parent, relative, or legal guardian, the enhancement is applicable under the second clause of the enhancement, which applies with a minor was "otherwise in the custody, care, or supervisory control of the defendant."

Guidelines commentary for both provisions explain that the enhancement "is intended to have broad application" and "the court should look to the actual relationship that existed between the defendant and the minor and not simply to the legal status of the defendant-minor relationship." USSG § 2G2.1 app. n.5(A); USSG § 2G1.3 app. n.2(A). Jane Doe's testimony at trial revealed that when she met defendant in April 2020, she was homeless—estranged from her mother who was a habitual drug user, and her father was incarcerated.[1] She immediately went to live with the defendant at the residence discussed by trial witnesses where he took the initial pictures of her, and stayed there when she was not at hotels that he had arranged and paid for her commercial sex dates. He confiscated her money, making her dependent on him for food, clothing and housing. Further, he assumed a particularly parental role in driving her to the Portsmouth Explorer's program.

The Fourth Circuit has upheld the application of this enhancement applies in extremely analogous circumstances. In *United States v. Muslim*, 944 F.3d 154, 169 (4th Cir. 2019), it rejected the defendant's argument that it was improperly applied because "the minor victim's relationship to Defendant was 'almost exclusively related to his role as a pimp and the underlying crimes.'" It

---

[1] To the extent Jane Doe's testimony did not cover these matters to the Court's recollection, the government can call Special Agent Rob Thomas to testify to the same.

4

noted that defendant acted as a "temporary caretaker" for the minor who "moved in with Defendant when she was under 18, after being kicked out of her aunt's house." *Id.* Also analogous to this case, there was evidence that the victim "relied on Defendant to drive her to high school" and that the Defendant provided for the victim. *Id.*

It is the government's understanding that the U.S. Probation Office did not apply the enhancement because of the commentary language that the enhancement "includes offenses involving a victim less than 18 years of age *entrusted to the defendant*, whether temporarily or permanently." USSG § 2G2.1 app. n.5(A); USSG § 2G1.3 app. n.2(A) (emphasis added). The government agrees there is not evidence of anyone formally "entrusting" Jane Doe to the defendant's care, but respectfully disputes that such a showing is always required in light of the inclusive word "includes" in the commentary along with the admonitions that the guideline is to be applied broadly and that the court is to consider the actual relationship between the minor and the defendant rather than focus on the formal legal relationship. Such a requirement would mean the enhancement could never apply where the victim was runaway, abandoned, homeless, or otherwise estranged from their parents and legal caregivers—as those parties would be unavailable to formally entrust the minor the care of anyone—which is unfortunately a very common risk factor for minors whom are sex-trafficked and otherwise abused. Further, as Special Agent Thomas can testify, there is evidence of at least acquiescence in the arrangement here, because Jane Doe's mother obtained her drugs from the defendant's associates and was thus well familiar with him. Further, in defendant's interview, admitted at trial, he admitted to picking up Jane Doe at her grandmother's house.

For all of these reasons, the government submits that the enhancement is merited and requests that the Court sustain its objection.

**III.     Standards Governing Sentencing**

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court rendered the Sentencing Guidelines purely advisory, but emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. *Id.* at 264. The Supreme Court reaffirmed this principle in *United States v. Kimbrough*, 552 U.S. 85 (2007), emphasizing that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Id.* at 90. Finally, in *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court instructed that the sentencing court should calculate the Sentencing Guideline range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. *Id.* at 49-50. The *Gall* Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* (noting that a "major departure should be supported by a more significant justification than a minor one.").

Applying these standards, the Fourth Circuit has concluded that a sentencing court must: "(1) properly calculate the Guideline range; (2) allow the parties to argue for the sentence they deem appropriate and determine whether the § 3553(a) factors support the sentences requested by the parties; and (3) explain its reasons for selecting a sentence." *United States v. Simmons*, 269 Fed. Appx. 272 at *1 (4th Cir. 2008) (*citing United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007)).

6

**IV.     Position on Sentencing and Argument**

Under 18 U.S.C. § 3553(a), when imposing a sentence, the Court should consider (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, (3) the need for the sentence imposed to promote the goals of sentencing, (4) the kinds of sentences available, (5) the sentencing guideline range, (6) any pertinent policy statement issued by the Sentencing Commission, (7) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (8) the need to provide restitution to any victims of the offense. For the reasons that follow, the government respectfully submits that a 40-year term of imprisonment is appropriate and reasonable in light of the Section 3553(a) factors.

A.     Nature and Circumstances of the Offense

The nature and circumstances of this offense are egregious and weigh in favor of a lengthy period of incarceration. During April and May 2022, the defendant sex-trafficked Jane Doe 2, who was 16 years old when she first met Smith. Jane Doe 2 was incredibly vulnerable when she first met the defendant. As she testified a trial, during her short life, she has experienced housing instability, food insecurity, withholding of food as a punishment, physical abuse, sexual abuse, an incarcerated father, and a mother who grappled with drug addiction and would abandon her and her siblings for days or weeks at a time. Jane Doe 2 struggled to have her basic needs met and to feel safe.

In October 2021, prior to being trafficked by Smith, a gang member was shot while driving a vehicle and crashed his car into Jane Doe 2's family home. At the time, Jane Doe 2 was experiencing a period of relative stability. Her mother had kicked out her abusive boyfriend and appeared to be sober. All of this stability changed with the car crash, which she described to the

investigators in one interview as "her worst day ever." The city condemned the family home, and she and her mother began to live in a hotel. Her mother relapsed on drugs and yet again, abandoned Jane Doe 2. She was then introduced to the defendant through another individual after she was almost kidnapped. PSR ¶ 12. Jane Doe 2 was desperate for someone to love and protect her. Smith pretended he would fill that void. Smith told Jane Doe 2 that she was special and exotic, and instructed her to follow his rules, including "no talking back, listen, and always ask the date… if they were a police officer." PSR ¶ 12-13.

Smith immediately sought to profit by sexually exploiting her. He took suggestive and child pornography images of Jane Doe 2 the very first day he met her. Smith had Jane Doe 2 dress up in a police officer sex costume and pose with a firearm in her mouth and between her legs. He was aware that Jane Doe 2 wanted to be a police officer and sometimes drove her to a program for children interested in law enforcement at a local police department. Smith then posted these images online in commercial sex advertisements and set up commercial sex appointments for Jane Doe 2.

Jane Doe 2's typical day working for Smith included sleeping during the day and working in the evening and at night. She typically engaged in anywhere from eight to twenty commercial sex dates per day, and Smith collected the money from her. The defendant trafficked Jane Doe 2 for weeks, including on her seventeenth birthday. He gave her drugs on a daily basis to keep her awake so she could earn him more money. PSR ¶ 13. He also told her she needed to look older and purchased her a wig and eyelashes to wear during commercial sex dates and in advertisements. Jane Doe 2 did not want to ingest the drugs, but he told her she needed to stay awake and she was afraid to tell him no. *Id*. Jane Doe 2 was aware of Smith's propensity for

violence, and knew that he had beaten another woman, nicknamed "Sunshine" because she was "crazy, stupid, and did not listen to Smith." PSR ¶ 25.

Jane Doe 2 later experienced Smith's violence firsthand after she accidently fell asleep with a john. PSR ¶ 10. Enraged, Smith pushed her on a bed while holding a gun. If Smith felt she was not listening to him, he called her a "dumb little bitch" and "stupid." PSR ¶ 13. She testified at trial that when Smith is angry, he is "the devil himself."

After Smith had been trafficking Jane Doe 2 for several weeks, the defendant came to the attention of law enforcement on May 19, 2022, when they received a tip about Smith trafficking a different female, Jane Doe 1. PSR ¶ 4. The tipster provided a contact number. Law enforcement acted quickly. An investigator contacted the number and set up a date for commercial sex at a hotel in Virginia Beach. After the investigators arrived at the hotel, an undercover detective was directed to the eleventh floor and made contact with a female, later identified as Jane Doe 2. PSR ¶ 6. Law enforcement determined that Jane Doe 2 was 17-years-old at the time she was encountered by law enforcement. PSR ¶ 7.

As they spoke with Jane Doe 2, they noted that she received a text message stating "I'm here when u done." From the eleventh floor of the hotel, they observed a vehicle on the top floor of the parking garage within view. The vehicle was occupied by one person, the defendant. Law enforcement arrested Smith and recovered a Glock pistol, three cellphones, cocaine, fentanyl, methamphetamine pills, amphetamine pills, and marijuana from Smith's vehicle. PSR ¶ 8.

Law enforcement transported Smith to Virginia Beach Police Department Headquarters. PSR ¶ 9. They advised the defendant of his *Miranda* rights, and he agreed to speak with the investigators. During that conversation, he admitted to knowing Jane Doe 2, knowing her real

name, and that he purchased wigs for her. He also stated that he was at the hotel to meet with Jane Doe 2.

The defendant's conduct with Jane Doe 2 alone is incredibly disturbing and warrants a 40-year period of incarceration. But the defendant's sexual exploitation of Jane Doe 2 was not an isolated incident. Jane Doe 2 was aware of the defendant trafficking other women and told investigators that Smith "ran" all of the girls. PSR ¶ 10. Other witnesses also report Smith's history of trafficking children and young women, including an inmate at the jail who stated that Smith knowingly drugged "his" females so that they would engage in sex acts. PSR ¶ 16.

A confidential source provided greater detail about Smith's ongoing crimes, including fraud, identity theft, money laundering, drug distribution, prostitution, human trafficking, firearm trafficking, robbery, and murder, and his gang involvement. PSR ¶ 18. According to the confidential source, the defendant was involved in prostituting approximately ten females, who did "everything Smith tells them to do." PSR ¶ 19. Smith provided the women heroin to "brainwash" them and occasionally beat the women he prostituted. The confidential source also reported that on one occasion, Smith intentionally dumped the contents of a trash can on the floor and had one of the females pick up the trash with her mouth. The confidential source further reported that Smith always "tests his own product," meaning he has sex with all of the females before he trafficked them. According to another source, Smith recruited underage females to sex traffic. PSR ¶ 24. Smith requested young males to invite young females to parties where Smith would lace their drinks with heroin in hopes of making the females become addicted to heroin. *Id*. It is clear from the witness statements that the defendant's trafficking of Jane Doe 2 was part of a disturbing, abusive pattern of sexually exploiting girls and women for his own financial gain.

Furthermore, after the defendant's arrest in this case, he did not withdraw from engaging in crime. Instead, after his arrest, Smith "green lit" Jane Doe 2, who was only 17-years-old at the time, meaning he approved this child to be killed by another individual. PSR ₱ 17. Jane Doe 2 relayed this information to law enforcement and advised that she was "green lit" because she was cooperating with the investigation. *Id*. Law enforcement corroborated the "green light" of Jane Doe 2 through two separate confidential sources. According to one confidential source, the defendant ordered an associate to carry out the hit, and Smith told the confidential source that no one would testify against him at trial because he will hurt that person or that person's family. PSR ₱ 20.

Jane Doe 2 was not the only witness threatened in this case. The original tipster was contacted by Jane Doe 1, who told the tipster to leave where the tipster was immediately because unknown males with firearms were looking for him. PSR ₱ 24. The original tipster ultimately did not testify at the defendant's trial. Jane Doe 1 reportedly began wearing a mask in public and hooded sweatshirts to cover her face in public.

Smith has a history of threatening and intimidating witnesses and anyone who attempts to enforce rules. While incarcerated, Smith discussed cutting the head off another individual, who Smith branded a "snake." PSR ₱ 15. Smith's jail calls were later revoked after he repeatedly conducted three way calls and used gang language. PSR ₱ 21. After his privileges were revoked, he told another inmate that if he were at a different jail, the corrections officer involved in the revocation would have already been "touched." Smith's Facebook account reflects that he posted a report of domestic violence filed by the mother of one of his children with the comment "I WILL NEVER HAVE A BBY WITH A RAT IM NOT RAISING NO MICE." PSR ₱ 23.

Unsurprisingly, Jane Doe 2 was terrified to testify at trial and told the investigators, "I'm really scared to testify against P… I don't want to go into the courtroom with P." PSR ¶ 32. She has asthma, and throughout the investigation, there have been times when she struggled to breathe when talking about the defendant. She continues to struggle with PTSD and nightmares.

Furthermore, the defendant remains a threat to Jane Doe 2. The government recently learned that the defendant is using a third party in the jail to reach out to Jane Doe 2 and told her that he is aware of the city in which she currently resides. The defendant has terrorized multiple people who would dare to speak to law enforcement about his crimes. The government respectfully asks the Court to consider the number of people who live in fear because of the defendant.

The defendant's offense conduct warrants a significant period of incarceration.

B.     History and Characteristics of the Defendant

The defendant is a 41-year-old man who is a documented Bloods/300 gang member. Although the defendant reports that his mother physically abused him when he was a child, his sister described the defendant as the "golden child that got away with everything" and stated that he was rarely disciplined. PSR ¶ 115. The defendant previously reported that eh was raised with adequate food, clothing, and shelter. PSR ¶ 117. The defendant was expelled from Portsmouth Public Schools and then enrolled in Norfolk Public Schools. PSR ¶ 118.

He began to engage in criminal activity when he was 14 years old and was arrested in July 1996 for grand larceny: auto theft. PSR ¶ 119. Two months later, he was charged with robbery after he stole money from another student at a school bus stop, and he was placed in the Norfolk Detention Home. PSR ¶ 119. A coordinator there noted that "Pierre's attitude and failure to comply with his treatment goals were on the verge of becoming major problems." PSR ¶ 120.

12

The defendant continued to violate the law, and at age 17, he was adjudicated delinquent for possession with intent to distribute marijuana and possession of a firearm by a minor.

The defendant continued to engage in criminal conduct throughout his adult life. He has been convicted of possession with intent to distribute marijuana, possession of cocaine, possession with intent to distribute cocaine, possession of marijuana, nonviolent felon in possession of a firearm, abduction: by force, intimidation or deception, sexual display; masturbation, actual/simulated, and various traffic offenses. PSR ¶ ¶ 82-92. He has been arrested on approximately fourteen other occasions that did not result in a criminal conviction. PSR ¶¶ 97-111. Even while incarcerated, the defendant continued to violate rules. After his 2001 conviction and incarceration for possession with intent to distribute marijuana, the defendant did not participate in any education or vocational programs, and instead, he committed 32 total offenses. PSR ¶ 82. The offenses included possession of intoxicants, possession of contraband, failure to follow count rules, possession of a weapon, gang activity, fighting, intentionally flooding, failure to follow posted or written regulation, being in an unauthorized area, disobeying an order, damage property, and indecent exposure. After his release on this conviction, he was found in violation and his probation was revoked. The defendant continued to violate rules and the law while being supervised. When he was on probation in Portsmouth after a 2015 conviction for possession of a firearm by a non-violent convicted felon, he obtained new criminal charges for assault and battery and failure to appear, and then absconded from supervision. PSR ¶ 89. He was later arrested and charged with soliciting prostitution from a minor, sex with a child, and contributing to the delinquency of a minor. His criminal history demonstrates his lack of respect for the law and need to be specifically deterred from engaging in criminal conduct.

13

  C. <u>Other Factors to be Considered Under 18 U.S.C. § 3553(a)</u>

Among the other factors a sentencing court is to consider under Section 3553(a), the United States would highlight the need for the sentence imposed in this case to reflect the seriousness of the defendant's offense, afford adequate deterrence to future criminal conduct, provide treatment to the defendant, and avoid unwanted sentencing disparities.

Based on the defendant's threats to Jane Doe, the United States further requests that the Court recommend that the defendant have no contact, directly or indirectly with Jane Doe, while incarcerated. *See United States v. Santos Diaz*, 66 F.4th 435 (3d Cir. 2023) ("a District Court has the authority to make recommendations to the BOP about [defendant's] conditions of confinement," but does not have "either statutory or inherent authority to impose [a] custodial no-contact order.") 66 F.4th at 441, 447. Furthermore, based on the defendant's multiple violations of probation, the government requests that the Court impose a lengthy period of supervised release.

**V. Conclusion**

The United States respectfully submits that a sentence of 40-years' imprisonment is sufficient, but not greater than necessary, to fulfill the purposes of Section 3553(a), and asks the Court to impose the same.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: /s/
Megan M. Montoya
Assistant United States Attorney
E. Rebecca Gantt

14

Assistant United States Attorney
Attorneys for the United States
United States Attorney's Office
101 W. Main St., Suite 800
Norfolk, VA 23510
Office Number: 757-441-6331
Facsimile Number: 757-441-3205
E-Mail Address: Megan.Montoya@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of July 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification to all counsel of record.

I hereby certify that on the 26h day of July 2023, I emailed a true and correct copy of the foregoing to the following:

Joshua A. Coleman
Senior United States Probation Officer


            /s/
Megan M. Montoya
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 W. Main St., Suite 800
Norfolk, VA 23510
Office Number: 757-441-6331
Facsimile Number: 757-441-3205
E-Mail Address: Megan.Montoya@usdoj.gov